CONTINENTAL CASUALTY COMPANY and another, Appellants, v. INDUSTRIAL COMMISSION and another, Respondents.

*June 2—June 25, 1965.*

For the appellants there was a brief by *Kracht & Zauner* of Milwaukee, and oral argument by *Edward J. Kracht.*

For the respondent Industrial Commission the cause was argued by *Gordon Samuelsen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the respondent Margaret Spinnler Hilty there was a brief by *Levy & Levy* of Cedarburg, and oral argument by *Lowell K. Levy.*

FAIRCHILD, J. *The challenged specific findings.* The commission found that Hilty had been employed by Justro "for about three years." Appellants correctly point out that Hilty's employment by Justro had begun four months before his death. This error is immaterial.

The commission found that the dogs had been "taken over" from Ready and belonged to Justro. It appears, as asserted by appellants, that Ready retained ownership of the dogs until they were sold or given away. The evidence, however, would support a finding that Justro undertook the disposal of the dogs and that Barr was acting in the course of his employment in disposing of them.

Mr. Barr testified that approximately 100 to 125 cats and 60 to 65 dogs were on the premises on the date of transfer; that, "It was mutually agreed between . . . Mr. Sheridan representing Ready Foods and Mr. Segel representing Justro, that I, as the plant manager, would dispose of the cats and dogs."

Mr. Segel testified that Justro had no use for the animals; that he told Barr to dispose of them; that it was done in the course of Barr's employment; that Segel was not concerned with how the dogs were disposed of; and that Barr had complete control over the men in the plant. Although Mr. Segel evidently felt that after Barr removed the dogs from the Justro premises, Justro had no further concern with them, the commission was not bound to accept his interpretation.

The commission found that the pistol belonged to Justro. Appellants object. Barr testified that the pistol had belonged to Ready Foods and had been kept for years in the file cabinet in Barr's office. The file cabinets and "all other furniture" were mentioned in the bill of sale. Barr testified that there were other small tools and items which were actually transferred, though not specifically listed. Mr. Segel was unaware of the presence of the gun. The ownership of the gun would not be controlling in any event, but the commission could properly find that it was transferred to Justro.

The commission found that Hilty "was carrying out the directions of his superior." Appellants argue that Barr made "requests" and that Hilty complied because of personal friendship.

It is true that the men had known each other for years and were friendly. Mr. Barr testified that he had "asked" Hilty to do the things he did on January 11th. He said that he customarily gave directions to his men by "asking;" that he considered that if he asked Hilty to do something about the dogs it became one of Hilty's duties. Although Barr testified, over objection, that when Hilty helped with the dog they

carried upstairs he did it "as a personal favor," the commission was not bound by that testimony to find that Hilty understood he was free to give or withhold the help. The evidence sustains the finding that Hilty was carrying out the directions of a superior.

*The alleged deviation.* As already indicated, the commission could and did properly find that the trip to Barr's kennel to shoot the two dogs and the return therefrom were for the benefit of Justro and within the scope of the men's employment. In transporting and handling the third dog, however, the men were serving a personal interest of Barr. The fatal accident occurred while the men were involved in the latter task.

This raises the question of the extent to which an employee is protected by the Workmen's Compensation Act while performing tasks outside the course of the employer's business, but at the direction of his superior in the employment. As pointed out by appellants there can be no liability unless at the time of the injury the employee is performing services growing out of and incidental to his employment and unless the accident arises out of the employment.[1]

Professor Larson states the rule as follows:

"When any person in authority directs an employee to run some private errand or do some work outside his normal duties for the private benefit of the employer or superior, an injury in the course of that work is compensable.

"The technical reason for these holdings is simply that, whatever the normal course of employment may be, the employer or his supervisory staff have it within their power to enlarge that course by assigning tasks outside the usual area. If they do not assign these tasks on the strength of the employer-employee relation on which compensability depends, then what is the source of authority by which the task is assigned?

"The practical reason for the rule is that any other view places the employee in an intolerable dilemma: if he complies

---

[1] Sec. 102.03 (1) (c) 1 and (e), Stats.

with the order, he forfeits compensation protection; if he does not comply, he gets fired." [2]

This court has not had occasion to deal with the exact problem. In *Metzger v. Industrial Comm.*[3] the employer was a painting contractor and hired employees to work in that business. The employer directed two of his employees to haul furniture to the employer's summer cottage. One was killed on the trip. We held that the fact that the task being performed was not customarily required in the employer's business did not suspend the status of the deceased as an employee in the usual course of business.

In *Olson Rug Co. v. Industrial Comm.*[4] several employees were working on a crew, soliciting orders, away from home. One employee, Allen, became ill. Instead of remaining in his rooming house, he asked the foreman, Carlson, to drive him to a city where he had relatives. Carlson did so after ordinary working hours and was injured while returning. This court said:

"An injury received by one who is merely performing a friendly act or courtesy for a coemployee is not compensable unless, at the time of performing such act, the employer owes to the employee a duty to perform the act by virtue of the contract of employment or the law. The service performed by the applicant was outside of his hours of employment, outside of what properly may be called his place of employment and in a place not provided or furnished by the employer or over which it had any control."

In the *Olson Rug Company Case* it was the subordinate who requested the superior to render a personal service, while in the instant case the superior made the request of the subordinate.

[2] 1 Larson, Law of Workmen's Compensation, pp. 421–424, sec. 27.40.

[3] (1931), 205 Wis. 339, 235 N. W. 802.

[4] (1934), 215 Wis. 344, 347, 254 N. W. 519.

The broad rule as stated by Professor Larson commends itself. It is not necessary in this case, however, to decide whether to adopt it completely. Perhaps there may be circumstances under which directions given by a superior would be so clearly unauthorized that services rendered in response thereto could not be said to grow out of or be incidental to the employment. In the case before us, however, the services in Barr's personal interest were rendered as an incident of the trip to and from the kennel; they were not only rendered at the direction of the superior, but were performed on the premises where Hilty's duties were ordinarily performed, and during his ordinary working hours. Under these circumstances it was proper to find that Hilty was performing services growing out of and incidental to his employment and that the accident arose out of the employment.

It was argued that under the positional-risk doctrine, Hilty's death was compensable because his presence at the point where he was killed was a result of his employment.[5] This may also be appropriate reasoning, but we do not rest our decision on it.

*By the Court.*—Judgment affirmed.

GORDON, J., dissents.

---

[5] See *Cutler-Hammer, Inc., v. Industrial Comm.* (1958), 5 Wis. (2d) 247, 254, 92 N. W. (2d) 824.